(Slip Opinion) OCTOBER TERM, 2020 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## RUTLEDGE, ATTORNEY GENERAL OF ARKANSAS *v.* PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 18–540.   Argued October 6, 2020—Decided December 10, 2020

Pharmacy benefit managers (PBMs) act as intermediaries between pharmacies and prescription-drug plans. In that role, they reimburse pharmacies for the cost of drugs covered by prescription-drug plans. To determine the reimbursement rate for each drug, PBMs develop and administer maximum allowable cost (MAC) lists. In 2015, Arkansas passed Act 900, which effectively requires PBMs to reimburse Arkansas pharmacies at a price equal to or higher than the pharmacy's wholesale cost. To accomplish this result, Act 900 requires PBMs to timely update their MAC lists when drug wholesale prices increase, Ark. Code Ann. §17–92–507(c)(2), and to provide pharmacies an administrative appeal procedure to challenge MAC reimbursement rates, §17–92–507(c)(4)(A)(i)(*b*). Act 900 also permits Arkansas pharmacies to refuse to sell a drug if the reimbursement rate is lower than its acquisition cost. §17–92–507(e). Respondent Pharmaceutical Care Management Association (PCMA), which represents the 11 largest PBMs in the country, sued, alleging, as relevant here, that Act 900 is preempted by the Employee Retirement Income Security Act of 1974 (ERISA). Following Circuit precedent in a case involving a similar Iowa statute, the District Court held that ERISA pre-empts Act 900. The Eighth Circuit affirmed.

*Held*: Arkansas' Act 900 is not pre-empted by ERISA. Pp. 4–10.

   (a) ERISA pre-empts state laws that "relate to" a covered employee benefit plan. 29 U. S. C. §1144(a). "[A] state law relates to an ERISA plan if it has a connection with or reference to such a plan." *Egelhoff*

v. *Egelhoff,* 532 U. S. 141, 147.  Act 900 has neither of those impermissible relationships.  Pp. 4–7.

　　(1) Act 900 does not have an impermissible connection with an ERISA plan.  To determine whether such a connection exists, this Court asks whether the state law "governs a central matter of plan administration or interferes with nationally uniform plan administration." *Gobeille* v. *Liberty Mut. Ins. Co.*, 577 U. S. 312, 320.  State rate regulations that merely increase costs or alter incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage are not pre-empted by ERISA.  See *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.,* 514 U. S. 645, 668.  Like the law at issue in *Travelers*, Act 900 is merely a form of cost regulation that does not dictate plan choices.  Pp. 4–6.

　　(2) Act 900 also does not "refer to" ERISA.  It does not " 'ac[t] immediately and exclusively upon ERISA plans,' " and " 'the existence of ERISA plans is [not] essential to the law's operation.' " *Gobeille*, 577 U. S., at 319–320.  Act 900 affects plans only insofar as PBMs may pass along higher pharmacy rates to plans with which they contract, and Act 900 regulates PBMs whether or not the plans they service fall within ERISA's coverage.  ERISA plans are therefore also not essential to Act 900's operation.  Pp. 6–7.

　(b) PCMA's contention that Act 900 has an impermissible connection with an ERISA plan because its enforcement mechanisms both directly affect central matters of plan administration and interfere with nationally uniform plan administration is unconvincing.  First, its claim that Act 900 affects plan design by mandating a particular pricing methodology for pharmacy benefits is simply a long way of saying that Act 900 regulates reimbursement rates.  Second, Act 900's appeal procedure does not govern central matters of plan administration simply because it requires administrators to comply with a particular process and may require a plan to reprocess how much it owes a PBM.  Taken to its logical endpoint, PCMA's argument would pre-empt any suits under state law that could affect the price or provision of benefits, but this Court has held that ERISA does not pre-empt "state-law mechanisms of executing judgments against" ERISA plans, *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U. S. 825, 831.  Third, allowing pharmacies to decline to dispense a prescription if the PBM's reimbursement will be less than the pharmacy's cost of acquisition does not interfere with central matters of plan administration.  The responsibility for offering the pharmacy a below-acquisition reimbursement lies first with the PBM.  Finally, any "operational inefficiencies" caused by Act 900 are insufficient to trigger ERISA pre-emption, even if they cause plans to limit benefits or charge plan members higher rates.  See *De Buono* v. *NYSA–ILA Medical and Clinical Services*

Syllabus

*Fund,* 520 U. S. 806, 816.　Pp. 7–10.

891 F. 3d 1109, reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which all other Members joined, except BARRETT, J., who took no part in the consideration or decision of the case.　THOMAS, J., filed a concurring opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 18–540

LESLIE RUTLEDGE, ATTORNEY GENERAL OF ARKANSAS, PETITIONER *v.* PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[December 10, 2020]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

Arkansas' Act 900 regulates the price at which pharmacy benefit managers reimburse pharmacies for the cost of drugs covered by prescription-drug plans. The question presented in this case is whether the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U. S. C. §1001 *et seq.*, pre-empts Act 900. The Court holds that the Act has neither an impermissible connection with nor reference to ERISA and is therefore not pre-empted.

I

A

Pharmacy benefit managers (PBMs) are a little-known but important part of the process by which many Americans get their prescription drugs. Generally speaking, PBMs serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use. When a beneficiary of a prescription-drug plan goes to a pharmacy to fill

a prescription, the pharmacy checks with a PBM to determine that person's coverage and copayment information. After the beneficiary leaves with his or her prescription, the PBM reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment. The prescription-drug plan, in turn, reimburses the PBM.

The amount a PBM "reimburses" a pharmacy for a drug is not necessarily tied to how much the pharmacy paid to purchase that drug from a wholesaler. Instead, PBMs' contracts with pharmacies typically set reimbursement rates according to a list specifying the maximum allowable cost (MAC) for each drug. PBMs normally develop and administer their own unique MAC lists. Likewise, the amount that prescription-drug plans reimburse PBMs is a matter of contract between a given plan and a PBM. A PBM's reimbursement from a plan often differs from and exceeds a PBM's reimbursement to a pharmacy. That difference generates a profit for PBMs.

In 2015, Arkansas adopted Act 900 in response to concerns that the reimbursement rates set by PBMs were often too low to cover pharmacies' costs, and that many pharmacies, particularly rural and independent ones, were at risk of losing money and closing. 2015 Ark. Acts no. 900. In effect, Act 900 requires PBMs to reimburse Arkansas pharmacies at a price equal to or higher than that which the pharmacy paid to buy the drug from a wholesaler.

Act 900 accomplishes this result through three key enforcement mechanisms. First, the Act requires PBMs to tether reimbursement rates to pharmacies' acquisition costs by timely updating their MAC lists when drug wholesale prices increase. Ark. Code Ann. §17–92–507(c)(2) (Supp. 2019). Second, PBMs must provide administrative appeal procedures for pharmacies to challenge MAC reimbursement prices that are below the pharmacies' acquisition costs. §17–92–507(c)(4)(A)(i)(*b*). If a pharmacy could not have acquired the drug at a lower price from its typical

wholesaler, a PBM must increase its reimbursement rate to cover the pharmacy's acquisition cost. §17–92–507(c)(4)(C)(i)(*b*). PBMs must also allow pharmacies to "reverse and rebill" each reimbursement claim affected by the pharmacy's inability to procure the drug from its typical wholesaler at a price equal to or less than the MAC reimbursement price. §17–92–507(c)(4)(C)(iii). Third, and finally, the Act permits a pharmacy to decline to sell a drug to a beneficiary if the relevant PBM will reimburse the pharmacy at less than its acquisition cost. §17–92–507(e).

B

Respondent Pharmaceutical Care Management Association (PCMA) is a national trade association representing the 11 largest PBMs in the country. After the enactment of Act 900, PCMA filed suit in the Eastern District of Arkansas, alleging, as relevant here, that Act 900 is pre-empted by ERISA. See 29 U. S. C. §1144(a) (ERISA pre-empts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan").

Before the District Court issued its opinion in response to the parties' cross-motions for summary judgment, the Court of Appeals for the Eighth Circuit decided, in a different case, that ERISA pre-empts a similar Iowa statute. *Pharmaceutical Care Mgmt. Assn.* v. *Gerhart*, 852 F. 3d 722 (2017). The Eighth Circuit concluded that the Iowa statute was pre-empted for two reasons. First, it made "implicit reference" to ERISA by regulating PBMs that administer benefits for ERISA plans. *Id.,* at 729. Second, it was impermissibly "connected with" an ERISA plan because, by requiring an appeal process for pharmacies to challenge PBM reimbursement rates and restricting the sources from which PBMs could determine pricing, the law limited a plan administrator's ability to control the calculation of drug benefits. *Id.,* at 726, 731. Concluding that Arkansas' Act 900 contains similar features, the District Court held that

ERISA likewise pre-empts Act 900. 240 F. Supp. 3d 951, 958 (ED Ark. 2017). The Eighth Circuit affirmed. 891 F. 3d 1109, 1113 (2018). This Court granted certiorari. 589 U. S. ___ (2020).

## II

ERISA pre-empts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U. S. C. §1144(a). "[A] state law relates to an ERISA plan if it has a connection with or reference to such a plan." *Egelhoff* v. *Egelhoff*, 532 U. S. 141, 147 (2001) (internal quotation marks omitted). Because Act 900 has neither of those impermissible relationships with an ERISA plan, ERISA does not pre-empt it.

## A

To determine whether a state law has an "impermissible connection" with an ERISA plan, this Court considers ERISA's objectives "as a guide to the scope of the state law that Congress understood would survive." *California Div. of Labor Standards Enforcement* v. *Dillingham Constr., N. A., Inc.*, 519 U. S. 316, 325 (1997) (internal quotation marks omitted). ERISA was enacted "to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures." *Gobeille* v. *Liberty Mut. Ins. Co.*, 577 U. S. 312, 320–321 (2016). In pursuit of that goal, Congress sought "to ensure that plans and plan sponsors would be subject to a uniform body of benefits law," thereby "minimiz[ing] the administrative and financial burden of complying with conflicting directives" and ensuring that plans do not have to tailor substantive benefits to the particularities of multiple jurisdictions. *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133, 142 (1990).

ERISA is therefore primarily concerned with pre-empting laws that require providers to structure benefit

plans in particular ways, such as by requiring payment of specific benefits, *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85 (1983), or by binding plan administrators to specific rules for determining beneficiary status, *Egelhoff*, 532 U. S. 141. A state law may also be subject to pre-emption if "acute, albeit indirect, economic effects of the state law force an ERISA plan to adopt a certain scheme of substantive coverage." *Gobeille*, 577 U. S., at 320 (internal quotation marks omitted). As a shorthand for these considerations, this Court asks whether a state law "governs a central matter of plan administration or interferes with nationally uniform plan administration." *Ibid.* (internal quotation marks and ellipsis omitted). If it does, it is pre-empted.

Crucially, not every state law that affects an ERISA plan or causes some disuniformity in plan administration has an impermissible connection with an ERISA plan. That is especially so if a law merely affects costs. In *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645 (1995), this Court addressed a New York law that imposed surcharges of up to 13% on hospital billing rates for patients covered by insurers other than Blue Cross/Blue Shield (Blues). Plans that bought insurance from the Blues therefore paid less for New York hospital services than plans that did not. This Court presumed that the surcharges would be passed on to insurance buyers, including ERISA plans, which in turn would incentivize ERISA plans to choose the Blues over other alternatives in New York. *Id.,* at 659. Nevertheless, the Court held that such an "indirect economic influence" did not create an impermissible connection between the New York law and ERISA plans because it did not "bind plan administrators to any particular choice." *Ibid.* The law might "affect a plan's shopping decisions, but it [did] not affect the fact that any plan will shop for the best deal it can get." *Id.,* at 660. If a plan wished, it could still provide a uniform interstate benefit package. *Ibid.*

In short, ERISA does not pre-empt state rate regulations that merely increase costs or alter incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage. *Id.,* at 668; cf. *De Buono* v. *NYSA–ILA Medical and Clinical Services Fund*, 520 U. S. 806, 816 (1997) (concluding that ERISA did not pre-empt a state tax on gross receipts for patient services that simply increased the cost of providing benefits); *Dillingham*, 519 U. S., at 332 (holding that ERISA did not pre-empt a California statute that incentivized, but did not require, plans to follow certain standards for apprenticeship programs).

The logic of *Travelers* decides this case. Like the New York surcharge law in *Travelers*, Act 900 is merely a form of cost regulation. It requires PBMs to reimburse pharmacies for prescription drugs at a rate equal to or higher than the pharmacy's acquisition cost. PBMs may well pass those increased costs on to plans, meaning that ERISA plans may pay more for prescription-drug benefits in Arkansas than in, say, Arizona. But "cost uniformity was almost certainly not an object of pre-emption." *Travelers*, 514 U. S., at 662. Nor is the effect of Act 900 so acute that it will effectively dictate plan choices. See *id.*, at 668. Indeed, Act 900 is less intrusive than the law at issue in *Travelers*, which created a compelling incentive for plans to buy insurance from the Blues instead of other insurers. Act 900, by contrast, applies equally to all PBMs and pharmacies in Arkansas. As a result, Act 900 does not have an impermissible connection with an ERISA plan.

B

Act 900 also does not "refer to" ERISA. A law refers to ERISA if it "'acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation.'" *Gobeille*, 577 U. S., at 319–320 (quoting *Dillingham*, 519 U. S., at 325; ellipsis omitted).

Act 900 does not act immediately and exclusively upon

ERISA plans because it applies to PBMs whether or not they manage an ERISA plan. Indeed, the Act does not directly regulate health benefit plans at all, ERISA or otherwise. It affects plans only insofar as PBMs may pass along higher pharmacy rates to plans with which they contract.

ERISA plans are likewise not essential to Act 900's operation. Act 900 defines a PBM as any "entity that administers or manages a pharmacy benefits plan or program," and it defines a "pharmacy benefits plan or program," in turn, as any "plan or program that pays for, reimburses, covers the cost of, or otherwise provides for pharmacist services to individuals who reside in or are employed in [Arkansas]." Ark. Code Ann. §§17–92–507(a)(7), (9). Under those provisions, Act 900 regulates PBMs whether or not the plans they service fall within ERISA's coverage.[1] Act 900 is therefore analogous to the law in *Travelers*, which did not refer to ERISA plans because it imposed surcharges "regardless of whether the commercial coverage [was] ultimately secured by an ERISA plan, private purchase, or otherwise." 514 U. S., at 656; see also *Dillingham*, 519 U. S., at 328 (concluding that the relevant California law did not refer to ERISA plans because the apprenticeship programs it regulated did not need to be ERISA programs).

## III

PCMA disagrees that Act 900 amounts to nothing more than cost regulation. It contends that Act 900 has an impermissible connection with an ERISA plan because its enforcement mechanisms both directly affect central matters of plan administration and interfere with nationally uniform plan administration. The mechanisms that PCMA identifies, however, do not require plan administrators to structure their benefit plans in any particular manner, nor

–––––––––

[1] PBMs contract with a variety of healthcare plans and programs that are not covered by ERISA, including Medicaid, Medicare, military, and market place plans.

do they lead to anything more than potential operational inefficiencies.[2]

PCMA first claims that Act 900 affects plan design by mandating a particular pricing methodology for pharmacy benefits. As PCMA reasons, while a plan might prefer that PBMs reimburse pharmacies using a MAC list constructed with an eye toward containing costs and ensuring predictability, Act 900 ignores that preference and instead requires PBMs to reimburse pharmacies based on acquisition costs. But that argument is just a long way of saying that Act 900 regulates reimbursement rates. Requiring PBMs to reimburse pharmacies at or above their acquisition costs does not require plans to provide any particular benefit to any particular beneficiary in any particular way. It simply establishes a floor for the cost of the benefits that plans choose to provide. The plans in *Travelers* might likewise have preferred that their insurers reimburse hospital services without paying an additional surcharge, but that did not transform New York's cost regulation into central plan administration.[3]

Act 900's appeal procedure likewise does not govern central matters of plan administration. True, plan administrators must "comply with a particular process, subject to state-specific deadlines, and [Act 900] dictates the substantive standard governing the resolution of [an] appeal." Brief for Respondent 24. Moreover, if a pharmacy wins its appeal, a plan, depending on the terms of its contract with a PBM, may need to recalculate and reprocess how much it

———————

[2] PCMA does not suggest that Act 900's enforcement mechanisms overlap with "fundamental components of ERISA's regulation of plan administration." *Gobeille* v. *Liberty Mut. Ins. Co.*, 577 U. S. 312, 323 (2016).

[3] PCMA also points to Act 900's requirement that PBMs update their MAC lists to reflect statutorily mandated prices. But that obligation does not affect plan design for the same reasons. Moreover, if PBMs were not required to update their MAC lists, they would be in constant non-compliance with Act 900's cost regulation.

(and its beneficiary) owes. But any contract dispute implicating the cost of a medical benefit would involve similar demands and could lead to similar results. Taken to its logical endpoint, PCMA's argument would pre-empt any suits under state law that could affect the price or provision of benefits. Yet this Court has held that ERISA does not preempt "state-law mechanisms of executing judgments against ERISA welfare benefit plans, even when those mechanisms prevent plan participants from receiving their benefits." *Mackey* v. *Lanier Collection Agency & Service, Inc.,* 486 U. S. 825, 831–832 (1988).

PCMA also argues that Act 900 interferes with central matters of plan administration by allowing pharmacies to decline to dispense a prescription if the PBM's reimbursement will be less than the pharmacy's cost of acquisition. PCMA contends that such a refusal effectively denies plan beneficiaries their benefits, but that argument misunderstands the statutory scheme. Act 900 requires PBMs to compensate pharmacies at or above their acquisition costs. When a pharmacy declines to dispense a prescription, the responsibility lies first with the PBM for offering the pharmacy a below-acquisition reimbursement.

Finally, PCMA argues that Act 900's enforcement mechanisms interfere with nationally uniform plan administration by creating "operational inefficiencies." Brief for Respondent 34. But creating inefficiencies alone is not enough to trigger ERISA pre-emption. See, *e.g., Mackey*, 486 U. S., at 831 (holding that ERISA did not pre-empt a state garnishment procedure despite petitioners' contention that such actions would impose "substantial administrative burdens and costs" on plans). PCMA argues that those operational inefficiencies will lead to increased costs and, potentially, decreased benefits. ERISA does not pre-empt a state law that merely increases costs, however, even if plans decide to limit benefits or charge plan members higher rates as a result. See *De Buono*, 520 U. S., at 816 ("Any state tax,

or other law, that increases the cost of providing benefits to covered employees will have some effect on the administration of ERISA plans, but that simply cannot mean that every state law with such an effect is pre-empted by the federal statute").

\*     \*     \*

In sum, Act 900 amounts to cost regulation that does not bear an impermissible connection with or reference to ERISA. The judgment of the Eighth Circuit is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BARRETT took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

No. 18–540

LESLIE RUTLEDGE, ATTORNEY GENERAL OF
ARKANSAS, PETITIONER *v.* PHARMA-
CEUTICAL CARE MANAGEMENT
ASSOCIATION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[December 10, 2020]

JUSTICE THOMAS, concurring.

I join the Court's opinion in full because it properly applies our precedents interpreting the pre-emptive effect of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U. S. C. §1144.

I write separately because I continue to doubt our ERISA pre-emption jurisprudence. *Gobeille* v. *Liberty Mut. Ins. Co.*, 577 U. S. 312, 327 (2016) (THOMAS, J., concurring). The plain text of ERISA suggests a two-part pre-emption test: (1) do any ERISA provisions govern the same matter as the state law at issue, and (2) does that state law have a meaningful relationship to ERISA plans? Only if the answers to both are in the affirmative does ERISA displace state law. But our precedents have veered from the text, transforming §1144 into a "vague and 'potentially boundless'. . . 'purposes and objectives' pre-emption" clause that relies on "generalized notions of congressional purposes." *Wyeth* v. *Levine*, 555 U. S. 555, 587 (2009) (THOMAS, J., concurring in judgment). Although that approach may allow courts to arrive at the correct result in individual cases, it offers little guidance or predictability. We should instead apply the law as written.

I

When construing a statutory provision, we begin with the text. *United States* v. *Alvarez-Sanchez*, 511 U. S. 350, 356 (1994). Section 1144(a) provides that certain of ERISA's provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" with certain exceptions not relevant in this case.

The term "supersede" precludes reading the statute as categorically pre-empting any state law related to employee benefit plans. Rather, it suggests a replacement or substitution instead of a blanket pre-emption. See Webster's Third New International Dictionary 2295 (1976) (defining "supersede" to mean, among other things, "to take the place of and outmode by superiority"); *District of Columbia* v. *Greater Washington Bd. of Trade*, 506 U. S. 125, 135–136 (1992) (Stevens, J., dissenting) (noting the word "supersede" is "often overlooked").

Where Congress seeks to pre-empt state laws *without* replacing them, it typically uses different words. See, *e.g.,* 84 Stat. 88, codified in 15 U. S. C. §1334(b) (stating in a "preemption" section that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act"); 49 U. S. C. §41713(b)(1) ("[A] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier"). Congress knows how to write sweeping pre-emption statutes. But it did not do so here. Applying the statutory text, the first step is to ask whether a provision in ERISA governs the same matter as the disputed state law, and thus could replace it.

The next step is to determine whether the state law "relate[s] to" employee benefit plans. 29 U. S. C. §1144(a). The Court has expressed concern that a *literal* reading of

this phrase is so broad that it is meaningless. See *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 655 (1995). But many times it is the ordinary, not literalist, meaning that is the better one. See, *e.g., McBoyle* v. *United States*, 283 U. S. 25, 26 (1931) ("vehicle" in the 1930s did not include aircraft because "in everyday speech 'vehicle' calls up the picture of a thing moving on land"). "[A] reasonable person conversant with applicable social conventions" would not understand "relate to" as covering any state law with a connection to employee benefit plans, no matter how remote the connection. Manning, What Divides Textualists From Purposivists? 106 Colum. L. Rev. 70, 77 (2006); see also *California Div. of Labor Standards Enforcement* v. *Dillingham Constr., N. A., Inc.*, 519 U. S. 316, 336 (1997) (Scalia J., concurring) (interpreting "relate to" literally would lead to results "no sensible person could have intended"). If someone, for instance, asserted that he is "related to Joe," it would be reasonable to presume a close familial relationship. No one would assume that the speaker was referencing a mutual tie to Adam and Eve. So too here. A state law needs more than a "tenuous, remote, or peripheral" connection with ERISA plans to trigger the statute. *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 100, n. 21 (1983); cf. *Wisconsin Dept. of Revenue* v. *William Wrigley, Jr., Co.*, 505 U. S. 214, 231 (1992) ("'the law cares not for trifles'").

## II

Here, the parties have not pointed to any ERISA provision that governs the same matter as Act 900. That alone should resolve the case. But the parties certainly cannot be faulted for not raising this argument. Our amorphous precedents have largely ignored this step. *E.g., District of Columbia*, 506 U. S., at 129.

Instead, we have asked only if the state law "'relate[d] to'" ERISA plans. *Ibid.* But this has proved problematic

because of "how much state law §1144 would pre-empt if read literally." *Gobeille*, 577 U. S., at 328 (THOMAS, J., concurring). Instead of reverting to the text, however, we decided that "relate to" is so "indetermina[te]" that it cannot "give us much help drawing the line." *Travelers*, 514 U. S., at 655.

Having paid little attention to the actual statutory test, we crafted our own, asking whether the challenged state law frustrates the "'objectives'" of ERISA. *Gobeille*, 577 U. S., at 320. Under this approach, the Court will declare as pre-empted "state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law." *Wyeth*, 555 U. S., at 583 (opinion of THOMAS, J.). Our case law states that under an objectives and purposes pre-emption approach, a state law is pre-empted if it has a "reference to" or an "impermissible connection with" ERISA plans. *Gobeille*, 577 U. S., at 319–320. But this vague test offered "no more help than" the "'relate to'" one. *Travelers*, 514 U. S., at 656.

Our more recent efforts to further narrow the test have just yielded more confusion. A state law references ERISA only if it "'acts immediately and exclusively upon ERISA plans. . . or where the existence of ERISA plans is essential to the law's operation.'" *Gobeille*, 577 U. S., at 319–320 (ellipsis in original). A connection with ERISA plans is impermissible only if it "'governs. . . a central matter of plan administration'" or "'interferes with nationally uniform plan administration.'" *Id.*, at 320. (ellipsis in original).[1] Alt-

———————
[1] We have also held that a state law might have an impermissible connection with ERISA plans if the indirect economic effects of the state law "force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers." *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 668 (1995).

hough, at first blush, that may seem more precise than asking if a law "relates to" ERISA, it has proven just as difficult to apply consistently, leading many members of the Court to suggest still other methods. See, *e.g., Egelhoff* v. *Egelhoff*, 532 U. S. 141, 152 (2001) (Scalia, J., concurring); *Aetna Health Inc.* v. *Davila*, 542 U. S. 200, 222–224 (2004) (Ginsburg, J., concurring). Instead of relying on this "accordion-like" test that seems to expand or contract depending on the year, Reece, The Accordion Type Jurisprudence of ERISA Preemption Creates Unnecessary Uncertainty, 88 UMKC L. Rev. 115, 124, n. 71 (2019), perhaps we should just interpret the text as written.

## III

*Stare decisis* concerns need not caution against a return to the text because the outcomes of our recent cases—if not the reasoning— are generally consistent with a text-based approach. Indeed, since *Travelers* every state law this Court has held pre-empted involved a matter explicitly addressed by ERISA provisions. See, *e.g.*, *Boggs* v. *Boggs*, 520 U. S. 833, 843–854 (1997) (pre-empting state law and discussing ERISA provisions with which it conflicts); *Aetna Health*, 542 U. S., at 204 (holding that states cannot create new causes of action that conflict with ERISA's "'interlocking, interrelated, and interdependent remedial scheme,'" located in §502(a) of ERISA).[2]

––––––––––

[2] The Court has found something to be "a central matter of plan administration" only when the matter is addressed by ERISA's text. *E.g., Egelhoff* v. *Egelhoff*, 532 U. S. 141, 148 (2001); *Gobeille* v. *Liberty Mut. Ins. Co.*, 577 U. S., at 321–322. And if the state law interferes with national uniformity but ERISA does not address the matter, we have held that the matter in question does not require uniformity. *Travelers*, 514 U. S., at 662; *ante*, at 5, ("not every state law that. . . causes some disuniformity in plan administration" is pre-empted). We have also held that ERISA does not pre-empt state laws regulating ERISA plans engaging in activity not regulated by ERISA, like running a hospital. See *De Buono* v. *NYSA–ILA Medical and Clinical Services Fund*, 520 U. S. 806

But it is not enough for this Court to reach the right con-clusions.  We should do so in the way Congress instructed.  Indeed, although we have generally arrived at the conclu-sions we would arrive at under a text-based approach, our capacious, nontextual test encourages departure from the text.  The decision below is testament to that problem.  We unanimously reverse that decision today, but we can hardly fault judges when they apply the amorphous test that we gave them.  We can and should do better.

––––––––––

(1997).  That makes sense because ERISA has nothing to say about those activities.