# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 25-3068

———————————————

Kevin Flowers, on Behalf of Himself and Other Arkansans Similarly Situated

*Plaintiff - Appellant*

v.

Caremark PCS Health, LLC, doing business as CVS Caremark; CaremarkPCS Pennsylvania Mail Pharmacy, LLC

*Defendants - Appellees*

———————

Appeal from United States District Court
for the Western District of Arkansas - Texarkana

———————

Submitted: April 14, 2026
Filed: June 29, 2026

———————

Before GRUENDER, BENTON, and ERICKSON, Circuit Judges.

———————

GRUENDER, Circuit Judge.

Kevin Flowers filed this class action suit against CaremarkPCS Health, LLC and CaremarkPCS Pennsylvania Mail Pharmacy, LLC (collectively, "Caremark"), claiming that Caremark unjustly enriches itself by failing to provide an adequate

pharmacy network as required under Arkansas law. The district court[1] granted Caremark's motion to dismiss. We affirm.

## I.

Kevin Flowers participates in an employee benefits plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). Through this plan, Flowers receives a prescription drug benefit. Caremark, as a pharmacy benefits manager ("PBM"), administers that benefit.[2] In doing so, Caremark maintains provider networks of pharmacies where plan members can fill their prescriptions. Flowers alleges that Caremark covers plan members' "maintenance prescriptions," i.e., prescriptions taken regularly for more than ninety days, only if plan members fill those prescriptions "at one of its CVS retail pharmacy stores or through its mail-order delivery service." Flowers claims that, by permitting only these options, Caremark violates two Arkansas statutes and thereby unjustly enriches itself.[3]

First, Flowers claims that Caremark violates Ark. Code Ann. § 17-92-119(b)(2) (the "Mail Order Provision"). In relevant part, the Mail Order Provision states that "[i]f a pharmacy . . . is owned or controlled by . . . [a] pharmacy benefits manager, . . . then the pharmacy, including any common ownership or controlling entities, . . . shall not require that a patient receive his or her prescriptions through

---

[1]The Honorable Susan O. Hickey, United States District Judge for the Western District of Arkansas.

[2]Caremark states that CaremarkPCS Pennsylvania Mail Pharmacy, LLC is not a PBM, but Flowers alleges otherwise in his complaint, and at the motion to dismiss stage, we assume that all facts Flowers alleges in his complaint are true. *See Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010).

[3]Flowers initially also brought claims for (1) a violation of Arkansas's Unfair Practices Act ("AUPA"), *see* Ark. Code. Ann. § 4-75-201 *et seq.*, and (2) "declaratory and injunctive relief." But these claims are not at issue because the parties stipulated to dismissal of Flowers's AUPA claim and agreed that Flowers's claim for "declaratory and injunctive relief" is not an independent cause of action.

home delivery services." § 17-92-119(b)(2). Flowers asserts that, by requiring plan members to fill their maintenance prescriptions either at Caremark CVS retail pharmacies or by mail, Caremark violates this requirement.

Second, Flowers claims that Caremark violates Ark. Code Ann. § 23-92-505(a)(1)(A) (the "Network Adequacy Provision"). The Network Adequacy Provision requires PBMs to provide "[a] reasonably adequate and accessible [PBM] network for the provision of prescription drugs . . . [with] convenient patient access to pharmacies within a reasonable distance from a patient's residence." § 23-92-505(a)(1)(A). Flowers asserts that, by requiring plan members to fill their maintenance prescriptions either at Caremark CVS retail pharmacies or by mail, Caremark violates this requirement as well, thereby forcing many plan members like him to pay out of pocket to fill their maintenance prescriptions at local pharmacies.

Caremark moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Flowers failed to plausibly plead a violation of the Mail Order Provision and that both the Mail Order Provision and the Network Adequacy Provision are preempted by ERISA. The district court granted Caremark's motion. Flowers appeals.

## II.

"We review *de novo* the district court's grant of a Rule 12(b)(6) motion to dismiss." *Pharm. Care Mgmt. Ass'n v. Gerhart*, 852 F.3d 722, 726 (8th Cir. 2017). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Here, Flowers has failed to state a plausible claim that Caremark unjustly enriched itself by violating the Mail Order Provision and the Network Adequacy Provision.

We can quickly dispense with Flowers's claim that Caremark violated the Mail Order Provision. This provision prohibits PBMs from requiring that patients receive their prescriptions through home delivery services. *See* § 17-92-119(b)(2).

-3-

But Caremark, as alleged, requires plan members to fill their maintenance prescriptions either by mail *or* at CVS pharmacies. Therefore, Flowers has not alleged facts sufficient to show that Caremark requires patients to fill prescriptions only through home delivery services. As Caremark rightly points out, Flowers has thus failed to plausibly plead that it violated the Mail Order Provision. *See Iqbal*, 556 U.S. at 678.[4]

Flowers's remaining claim, that Caremark violated the Network Adequacy Provision, is more complicated. As noted above, this provision requires PBMs to provide a "reasonably adequate and accessible" network. *See* Ark. Code Ann. § 23-92-505. The Network Adequacy Provision does not define "reasonably adequate and accessible." But a different statutory provision requires Arkansas's Insurance Commissioner to "adopt rules relating to a pharmacy benefits manager's network adequacy." § 23-92-509(2)(A). And pursuant to this delegated authority, the commissioner promulgated implementing regulations clarifying that "a pharmacy network is adequate if the pharmacy network meets [certain] network adequacy distances." Code Ark. R. 003.22.118-7(A)(1)-(2) (citing § 23-92-505). As Flowers and Caremark observe, these regulations require PBMs to ensure that:

> (i) At least ninety percent (90%) of individuals covered by a health benefit plan in an urban area served by the health benefit plan . . . live within two (2) miles of a network pharmacy that is a retail community pharmacy;
>
> (ii) At least ninety percent (90%) of individuals covered by a health benefit plan in suburban areas served by the health benefit plan . . . live within five (5) miles of a network pharmacy that is a retail community pharmacy; and
>
> (iii) At least seventy percent (70%) of individuals covered by a health benefit plan in a rural area served by the health benefit plan . . . live within fifteen (15) miles of a network pharmacy that is a retail community pharmacy.

---

[4]We need not reach whether ERISA preempts the Mail Order Provision.

§ 23-92-509(b)(2)(B)(i)-(iii); *see* Code Ark. R. 003.22.118-7(A)(1)-(2) (adopting "the standards in Ark. Code Ann. § 23-92-509(b)(2)(B)"). To summarize, the Network Adequacy Provision's implementing regulations require PBMs to ensure that certain minimum percentages of plan members live within specified distances of an in-network, retail community pharmacy. We will label these requirements, reproduced above, as the "Geographic Coverage Requirements."

We pause here to make two observations. First, Flowers's theory for why Caremark violates the Network Adequacy Provision appears to be that Caremark violates the Geographic Coverage Requirements. Flowers explains that the Network Adequacy Provision "merely requires the inclusion of local pharmacies in networks so that beneficiaries may choose to fill their prescriptions locally." He states that "§ 2-92-509 establishes the rules governing pharmacy benefit network adequacy." And invoking the Geographic Coverage Requirements, he notes that "[r]easonable adequacy and accessibility requires that minimum percentages of individuals covered by a plan must live within a specified distance of a 'network pharmacy that is a retail community pharmacy.'"

Second, however, we have found no factual allegations in Flowers's complaint, aside from that Caremark requires plan members to fill certain prescriptions at a CVS retail pharmacy or by mail, to show that Caremark violates the Geographic Coverage Requirements—or that Caremark otherwise fails to provide a reasonably adequate and accessible network. To illustrate, Flowers makes no factual allegations describing the number or location of CVS retail pharmacies or plan members' proximity to those pharmacies. Nonetheless, because Caremark has not raised this point, we proceed to the parties' primary focus on appeal: whether ERISA preempts the Geographic Coverage Requirements.[5] *See Ivey v. Audrain*

[5]In our view, the proper analysis is not whether ERISA preempts the Network Adequacy Provision as a whole, but instead whether ERISA preempts, specifically, the Geographic Coverage Requirements imposed by the provision's implementing regulations. The district court held that ERISA preempts the Network Adequacy Provision. But its discussion focused on "geographic parameters" (i.e., the

*Cnty.*, 968 F.3d 845. 850-51 (8th Cir. 2020) ("Though we may affirm a district court's decision on any ground that the record supports, . . . we usually do so when a party advances that alternative ground, not when we raise the matter sua sponte without giving the appellant a chance to respond.").

Although preemption is generally an affirmative defense, *see Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 886 (8th Cir. 2005), this defense can warrant dismissal under Rule 12(b)(6) if it is "apparent on the face of the complaint." *Stephens v. Target Corp.*, 694 F. Supp. 3d 1136, 1142 (D. Minn. 2023) (quoting *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 983 (8th Cir. 2008)). At this stage, we can therefore evaluate whether ERISA preempts the Geographic Coverage Requirements, provided that we review only "the materials properly before [us] on a motion to dismiss." *See Noble Sys.*, 543 F.3d at 983; *see also Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017).

We review *de novo* "the question of whether ERISA preempts a State law." *Gerhart*, 852 F.3d at 726. ERISA expressly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" that ERISA governs. *See* 29 U.S.C. § 1144(a); *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016). "[A] state law relates to an ERISA plan if it has a connection with or reference to such a plan." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001). As the district court observed, Caremark focuses solely on "the 'connection with' part of this inquiry," *see id.*, arguing that the Geographic Coverage Requirements impermissibly connect with ERISA plans.

---

Geographic Coverage Requirements), which come not from the Network Adequacy Provision but instead from its implementing regulations. *See* Code Ark. R. 003.22.118-7(A)(1)-(2) (adopting requirements from § 2-92-509(b)(2)(B)(i)-(iii)). And accordingly, the parties' arguments on appeal focus on the Geographic Coverage Requirements. We thus expressly leave open the question of whether the Network Adequacy Provision, standing on its own or implemented through different regulations, would be preempted by ERISA.

To determine if a state law has an impermissible connection with ERISA plans, "we look both to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive as well as to the nature of the effect of the state law on ERISA plans." *Id.* (citation modified). Therefore, we have held that a state law impermissibly connects with an ERISA plan "if and only if (1) it 'governs a central matter of plan administration'; (2) it 'interferes with nationally uniform plan administration'; or (3) 'acute, albeit indirect economic effects of the law force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers.'" *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 968 (8th Cir. 2021) (quoting *Gobeille*, 577 U.S. at 320) (citation modified). "Crucially, not every state law that affects an ERISA plan or causes some disuniformity in plan administration has an impermissible connection with an ERISA plan." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 87 (2020). "ERISA is . . . primarily concerned with pre-empting laws that require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits or by binding plan administrators to specific rules for determining beneficiary status." *Id.* And "pre-emption does not occur if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 661 (1995) (citation modified).

Applying these principles in *Wehbi*, we evaluated whether certain provisions of a North Dakota law that regulated PBMs had an impermissible connection with ERISA plans. *See* 18 F.4th at 964-66, 968-69. We explained that, as a threshold matter, "because PBMs manage benefits on behalf of plans, a regulation of PBMs functions as a regulation of an ERISA plan itself." *See id.* at 966 (citation modified). But, as Flowers observes, we upheld two statutory provisions (the "Accreditation Provisions") that prohibited a PBM from imposing pharmacy accreditation requirements "as a condition for participation in its network" that were "inconsistent with, more stringent than, or in addition to federal and state requirements for licensure as a pharmacy in [the] state." *Id.* at 968, 965-66 (citing ND. Cent. Code

-7-

Ann. § 19-02.1-16.1.11, -16.2.4). We determined that the Accreditation Provisions bore none of the three qualities that constitute an impermissible connection with ERISA plans. *See id.* at 968. The Accreditation Provisions governed only a "noncentral" matter of plan administration. *Id.* They had, at most, "*de minimis* economic effects." *Id.* And although they might have caused "some disuniformity in plan administration [across states] by requiring PBMs to maintain different accreditation requirements in different states," any disuniformity was, at most, "modest." *Id.* (citation modified).

Here, however, the Geographic Coverage Requirements cause a far less "modest" disuniformity in plan administration than the Accreditation Provisions in *Wehbi*. Although the Geographic Coverage Requirements nominally permit PBMs to retain some flexibility to design their networks, the requirements "forc[e] . . . [a] particular scheme of substantive coverage." *See Rutledge*, 592 U.S. at 88; *see also Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183, 1201 n.14 (10th Cir. 2023) ("Nor does ERISA preempt only state laws that bind health plans to a specific choice." (citation modified)). At minimum, the Geographic Coverage Requirements force PBMs to ensure that ninety percent of plan members in "an urban area" live within two miles of an in-network, retail community pharmacy; ninety percent of plan members in "suburban areas" live within five miles of such a pharmacy; and seventy percent of plan members in "a rural area" live within fifteen miles of such a pharmacy. *See* § 23-92-509(b)(2)(B)(i)-(iii). If a plan member moves from an urban area to a rural one or from one block to another, or a rural area becomes a suburban area, or an in-network pharmacy closes down, PBMs must adjust their networks accordingly. And consider Congress's objectives. Congress enacted ERISA to "minimiz[e] the administrative and financial burden of complying with conflicting directives and ensur[e] that plans do not have to tailor substantive benefits to the particularities of multiple jurisdictions." *Rutledge*, 592 U.S. at 86 (citation modified). The Geographic Coverage Requirements bulldoze through these objectives, requiring PBMs to tailor and retailor their networks—and perhaps even build new brick-and-mortar pharmacies—to comply with a set of exacting particularities.

Contrast the Geographic Coverage Requirements with the Accreditation Provisions in *Wehbi*. The Accreditation Provisions gave a simple, easily administrable instruction to PBMs: PBMs could not impose accreditation requirements on pharmacies other than federal and state licensing requirements, *see Wehbi*, 18 F.4th at 965-66. To comply with the Accreditation Provisions, PBMs needed only to (1) know what those federal and state licensing requirements were, which PBMs would need to do anyway, and (2) not impose other accreditation requirements. Any resulting disuniformity in plan administration was modest.

Further, contrary to Flowers's arguments, *Wehbi* never announced a broad rule that laws regulating pharmacy network composition govern a noncentral matter of plan administration. Instead, we held that the *particular* provisions in *Wehbi*— which limited the accreditation requirements PBMs could impose on pharmacies— governed a noncentral matter of plan administration. *See* 18 F.4th at 968; *see also Iowa Ass'n of Bus. & Indus. v. Ommen*, 799 F. Supp. 3d 795, 826 (S.D. Iowa 2025) (distinguishing the provisions in *Wehbi* from other laws affecting PBM networks). Similarly, *Wehbi* never announced a broad rule that laws regulating pharmacy network composition necessarily have only *de minimis* economic effects. In *Wehbi*, we assessed particular provisions' economic effects after reviewing a fact record developed before summary judgment. *See* 18 F.4th at 966. Here, at the motion to dismiss stage, the record on the Geographic Coverage Requirements' economic effects is not developed enough to permit such an assessment. In any event, given the Geographic Coverage Requirements' interference with plan administration uniformity, we need not resolve whether they constitute "regulation of a noncentral 'matter of plan administration' with *de minimis* economic effects." *See Wehbi*, 18 F.4th at 968. Either way, ERISA preempts them.

Flowers points out that the Geographic Coverage Requirements neither "require payment of specific benefits" nor "bind plan administrators to specific rules for determining beneficiary status." *See id.* (citation modified). But these are simply *illustrations*—not an exhaustive overview—of how state laws might "structure benefit plans in particular ways" and thereby risk running afoul of ERISA. *See id.*;

*Rutledge*, 592 U.S. at 86-87; *see also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 98 (1983) (noting that ERISA's express-preemption provision, 29 U.S.C. § 1144(a), cannot "be interpreted to pre-empt only state laws dealing with the subject matters covered by ERISA"). ERISA can also preempt state laws that do not perform these functions.

We conclude that the Geographic Coverage Requirements are preempted and therefore "without effect." *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). Flowers's argument that Caremark violates them does not amount to a plausible claim of unjust enrichment.[6] *See Iqbal*, 556 U.S. at 678.

## III.

For the foregoing reasons, we affirm.

_____

---

[6]As alternative grounds for affirmance, Caremark argues that (1) Arkansas has not recognized an unjust enrichment claim for a violation of a statute that lacks a private right of action, and (2) Flowers's unjust enrichment claim fails because he has not alleged that he, personally, conferred any benefit to Caremark. We need not reach these issues to resolve this case.

-10-